**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANGELA HOENIG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 2:21-342 |
| | ) | |
| | ) | Magistrate Judge Dodge |
| NASCO HEALTHCARE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Angela Hoenig ("Hoenig") brings this action under Pennsylvania law against her former employer, Defendant Nasco Healthcare, Inc. ("Nasco"), in which she seeks unpaid commissions and bonuses to which she claims to be entitled.

Currently pending before the Court is Nasco's motion for summary judgment (ECF No. 80). For the reasons that follow, the motion will be granted in part and denied in part.[1]

### I.   Relevant Procedural History

Hoenig commenced this action in March 2021 and filed an Amended Complaint on May 31, 2022 (ECF No. 33). Subject matter jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332(a).

The original Complaint included claims for breach of contract and violation of the Pennsylvania Wage Payment and Collection Law, 43 P.S. §§ 260.1-260.12 (WPCL). After some discovery, Hoenig amended her complaint to add two additional counts of fraudulent concealment and fraud. The damages sought in the Amended Complaint are substantially higher than those sought in the original Complaint.

---

[1] The parties have fully consented to jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1). (ECF Nos. 7, 9.)

After additional discovery was completed, Nasco filed a motion for summary judgment on August 7, 2023, (ECF No. 80), which has been fully briefed (ECF Nos. 81, 92, 99, 111).[2]

## II.   **Relevant Facts**[3]

### A.  Background Regarding Hoenig's Employment

Hoenig was originally engaged as an independent contractor by Simulaids, Inc. ("Simulaids") in May 2015. (Defendant's Amended Concise Statement of Material Facts ("DACSMF") ¶ 16) (ECF No. 84.) According to Defendant, she was later hired by Simulaids as a full-time sales representative in or about October of 2016. She was recruited by Jack McNeff. (DACSMF ¶¶ 16-18.)

In 2017, Simulaids hired two additional salespersons, Rush Goodson and Matthew Long. (DACSMF ¶¶ 23.) Nasco asserts that Long and Goodson were subject to the same compensation and commission plan under which Hoenig worked other than their respective base salaries and territories.[4]

According to Defendant, Nasco Healthcare, Inc. resulted from the merger of Simulaids, located in Saugerties, New York, and Nasco Healthcare Inc., located in Fort Atkinson, Wisconsin ("Nasco Wisconsin").[5] Prior to the merger, Simulaids and Nasco Wisconsin each

---

[2] Nasco contemporaneously filed a motion to strike Hoenig's affidavit as a sham (ECF No. 102). By order dated March 19th, 2024, the Court granted this motion in part and denied it in part (ECF No. 113).

[3] The parties submitted a substantial number of facts, and as will be reflected throughout this opinion, the parties dispute a substantial number of these facts. Many of the facts in the record are not dispositive to the outcome here, and therefore, will only be referenced as necessary.

[4] The Court takes judicial notice of the fact that both Goodson and Long have also filed cases against Nasco seeking unpaid commissions in the United States District Courts for the Northern District of Texas and the Northern District of Illinois, respectively. See ECF No. 85 Ex. 1 at 1 (reflecting that McNeff's deposition was taken once for use in all three cases).

[5] Hoenig disputes that this entity was ever known as "Nasco Wisconsin." (See, e.g., PCSMF ¶¶ 5, 39.) It is clear, however, that this designation was made by Defendant to differentiate this company from the company that survived the merger discussed in the body of this opinion.

manufactured and sold products for use in certain industries, including the healthcare industry. Some of their products included training tools, body part models, and other noninteractive training aids for hospitals, medical schools, and other settings. Simulaids also manufactured and sold sophisticated and "high-fidelity" manikins[6] designed to interact with trainees by mimicking patient symptoms to make the training realistic. (DACSMF ¶¶ 1-4.) Simulaids and Nasco Wisconsin sold their products directly to end-users such as hospitals, EMTs, fire departments, and medical schools ("Direct Sales"). (DACSMF ¶ 38.) In addition, they sold products internationally ("International Sales"); sold parts to other original equipment manufacturers ("OEM Sales"); and sold to customers through the internet and customer service calls. (DACSMF ¶ 39.)

Nasco states that the merger occurred in January 2021, at which time Hoenig became an employee of Nasco. (DACSMF ¶ 56.)[7] By contrast, Hoenig notes that Nasco's website states that the merger of Simulaids and Nasco occurred in 1999. (PCSMF ¶¶ 1, 56.) Hoenig contends that as of October 5, 2016, Simulaids and Nasco Healthcare had already merged and she was employed by a division of "Nasco International" called "Simulaids." (Plaintiff's Counterstatement of Material Facts) ("PCSMF") ¶ 17) (ECF No. 93).)[8] Hoenig asserts that throughout her employment, she sold to many customers who were shared between the two companies.

Hoenig left the employ of Nasco on April 6, 2021. (DACSMF ¶ 37.)

Before the merger, Simulaids and Nasco Wisconsin maintained separate corporate identities and operations. They also sold and furnished products to each other through arms-

---

[6] "A mannequin is a dummy that is used to display clothes," while "a manikin is a jointed model of a human body that is used by artists or for medical training." https://grammarist.com/homophones/mannequin-manikin-or-manakin/

[7] However, Hoenig has submitted a copy of a paycheck received from Nasco Healthcare Inc. dated July 12, 2020. (Pl.'s App. at 27) (ECF No. 94.)

[8] Neither party has identified "Nasco International" or any role it might play in this dispute.

length intercompany sales ("Intercompany Sales"). Each maintained its own customer accounts, had separate employees, and recorded sales through different programs. Simulaids recorded its sales data in a system called "MAPICS" or "INFOR"; Nasco Wisconsin did so through the "P-8" system. (DACSMF ¶¶ 5-8.)

B. The Parties Dispute Certain Elements of Hoenig's Commissions

Nasco states that Hoenig was hired with a base salary of $70,000.00 and was told she would receive "commissions as approved." When she was employed by Simulaids, she received her paychecks from Simulaids, and they reflected the amount she was receiving in commissions from Simulaids. (DACSMF ¶¶ 19-21.) Hoenig claims that by at least by December 2016, she was employed by Nasco, was given performance reviews by Nasco and received her paychecks from Nasco Healthcare, Inc. (PCSMF ¶ 20.)

Hoenig's commission agreement was revised in April 2017. As referenced in the Complaint and Amended Complaint, Jack McNeff sent her an email dated April 11, 2017 with an attachment identified as "The Domestic Commission Plan." (Pl.'s App. at 37-38) (ECF No. 94).) McNeff was the Vice President of Sales until 2021, Hoenig's direct supervisor and responsible for reviewing and approving all commission payments. (DACSMF ¶¶ 30, 44.) McNeff's email states in part that "[w]e didn't really get a chance to dive into this. Here is an outline." (Pl.'s App. at 37.) Further, it states, "[a]ll direct sales need to go through Simulaids so I can track." (*Id.*)

The Domestic Commission Plan reads as follows:

- Sales goals total sales $860,000
- ALEX[9] 4% until above goal then 6%
  - Goal 37 per year (3 quarters)
- Smart products 4%

---

[9] ALEX is a high-fidelity manikin. (DACSMF ¶ 18.)

- o Goal 15 units (3 quarters) any unit Basic, Smart or Mom
- Dealer sales 2% over plan number (increase in sales)
  - o 4,847,00[0] (2% over last year)
- Station trainers 2%
- Selected items 10% (items we want to promote)
- Bonus $5,000 per quarter for hitting sales unit goals
- $5,000 extra for all quarters

(*Id.* at 38.)[10]

Thus, according to Nasco, pursuant to the terms of the Domestic Commission Plan, Hoenig would receive payment of commissions on dealer sales ("Dealer/Distributor sales") only if the total dealer sales for Simulaids exceeded the previous year's sales by 2%. (DACSMF ¶¶ 30-32.) Hoenig denies that this was her commission structure. (PCSMF ¶¶ 25, 31-32.)

In paragraph 12(B) of the Hoenig Affidavit that was submitted in opposition to Nasco's motion for summary judgment, Hoenig contends that after she received the April 11, 2017 email from McNeff, she:

> protested the proposal in the fourth bullet point, which suggested that I would be required to match my previous year's dealer/distributor sales before receiving commission on any sales that exceeded last year's sales. Mr. McNeff assured me that the proposal was only an outline, that nothing had been finalized, and that he would be presenting the final proposal at some time in the near future.

(Hoenig Aff. ¶ 12(B).) As Nasco notes, however, Hoenig testified as follows at her deposition:

> Q. Now, you were -- you had entered into this agreement, alleged agreement, with Simulaids at or about the same time that Mr. Long and Mr. Goodson were hired.
>
> A. I was part of negotiations of this agreement prior to them being hired, and then we all entered it -- I entered the portion earlier than their hire date, but, yes.

---

[10] Hoenig claims that the attachment to the April 11, 2017 email has two inaccuracies. First, the "sales goals" of $860,000 was only her goal for ALEX sales, not total annual sales. Moreover, she asserts that the reference to $4,847,00 [sic] represents Hoenig's total annual sales, not dealer sales. (PCSMF ¶ 119.) In turn, Nasco denies that the figure of $860,000 represents anything other than her total sales goal. Further, it claims that the $4,487,00[0] figure is included as a sub-bullet under "dealer sales 2% over plan number," thereby demonstrating that this number is reflective of Dealer/Distributor sales. (DCPAMF ¶ 119) (ECF No. 98.)

Q. Okay. And with whom did you negotiation [sic] the terms of this new commission structure?

A. **Jack gave me the new commission structure. There was no[] negotiation of it.**

Q. Okay, all right. So there was no back and forth, no discussion of different terms. It was just a take it or leave it type thing?

A. I trusted him.

Q. Well, it was take it or leave it?

A. Well, **that's what he offered me and I did it**, because I wanted to work at the company.

(Hoenig Dep. 92:11-93:5) (emphasis supplied.)[11]

The parties agree that Hoenig and McNeff had a conversation at some point after the April 11, 2017 email was sent. (PCSMF ¶ 121; (Defendant's Counterstatement to Plaintiff's Alleged Additional Material Facts ("DCPAMF") ¶ 121) (ECF No. 98). They disagree about what was said, however. Hoenig testified that McNeff promised her that she would receive a 2% commission on all Dealer/Distributor sales, regardless of her involvement in the sale. Nasco denies that he made any such promise. (*Id.* ¶¶ 122-23.)

According to Hoenig, an email from McNeff dated April 24, 2017 sets forth a revised commission agreement. (PCSMF ¶¶ 25, 28-29.) McNeff states in the email that "here is the commission rates we discussed." Attached to this email is a document called "Proposed

---

[11] As stated in the Court's opinion regarding Nasco's motion to strike Hoenig's Affidavit, the Court has stricken Paragraph 12(B) because it completely contradicts her prior deposition testimony without a satisfactory explanation. In addition, the Complaint and Amended Complaint also allege that the April 11, 2017 email set forth the revised commission agreement. Therefore, paragraph 12(B) will not be considered in conjunction with this opinion. While Hoenig points to other evidence about the commission plan that preceded the April 11, 2017 email (see PCSMF ¶¶ 25(A-D), 110), her admission that she agreed to the terms set forth therein makes evidence about prior communications, discussions and negotiations irrelevant.

Domestic Commission Schedule."[12] Hoenig notes that there is no mention in the email or its attachment of a limitation on her commission on Dealer/Distributor sales, including that she would only be paid commissions on sales above the previous year's total.

In Nasco's motion to strike, it asserts that Hoenig testified during her deposition that she is not relying upon the April 24, 2017 email to support her claims. However, her testimony on this issue is ambiguous as best, as she testified both that this email supports her claims and that the attachment does not *demonstrate* that Simulaids committed to pay her a 2% commission on all distributor sales into her territory. (Hoenig Dep. at 200-01) (ECF No. 110 at 5.)[13]

Hoenig points to other evidence that she claims supports her position that Nasco agreed to pay her a 2% commission on all Dealer/Distributor sales into her territory. For example, on June 26, 2017, Kelly Jacobson, who reported directly to McNeff, sent an email to Long (who had the same commission structure as Hoenig) describing the commission structure that applied to him. In this email, Jacobson described the commission to be paid on sales to distributors: "2% on distributor sales in your territory." No limitations were outlined. Further, Olivia Nelligan, McNeff's immediate supervisor, emailed McNeff on October 21, 2017, and repeated the commission plan described in his April 24, 2017 email. According to Hoenig, McNeff acknowledged that the commission plan called for a 2% commission on Dealer/Distributor sales. Finally, two years later, McNeff sent an email to salesperson John Bohrman and attached the

---

[12] The April 24 email and attachment are produced in Hoenig's Appendix at pp. 39-40.

[13] As Hoenig observes in her response to Nasco's motion to strike certain relevant paragraphs of her Affidavit, her deposition testimony is subject to various interpretations, including that she believed there were other documents that supported her claim that the commission agreement was represented by the "demo proposed" attachment to the April 24 email. She also testified that she believed the new commission agreement was embodied in the attachment. Further, it is not dispositive if the attachment did not *demonstrate* the agreement as long as there is other evidence to support it.

Domestic Commission Plan that he had attached to his April 11, 2017 email to Hoenig. In this email, which references the attachment, McNeff admits that "the dealer portion 'never happened.'" (PCSMF ¶¶ 25(G-I), 113-117, 124.)

Nasco disputes the meaning of these communications. It notes that the Jacobson email was sent to Long, not Hoenig, and did not describe her commission structure. In addition, the email also stated: "Any sales you have going through Fort [i.e., Nasco Wisconsin], keep a spreadsheet on and send it to me weekly. I don't want you losing any credit for sales that you bring in," which Nasco states demonstrates the requirement that Hoenig had to "bring in" a Nasco Wisconsin sale to get credit for it. (DCPAMF ¶ 114.) Similarly, Jacobson's reference to Dealer/Distributor sales did not make it Hoenig's commission plan. (*Id.* ¶ 115.) Jacobson had no supervisory authority over Hoenig and no involvement with her compensation. When asked what she meant regarding Dealer/Distributor sales, Jacobson stated "I frankly don't know any more than the percentages. That's what Jack gave me." (DACSMF ¶¶ 91-93; DCPAMF ¶ 116.) Further, Nelligan's October 21, 2017 email did not say anything about Hoenig receiving a 2% commission on Dealer/Distributor sales. (DCPAMF ¶ 117.) Nasco denies that McNeff made any sort of "admission" in his email to Bohrman on May 31, 2019. (*Id.* ¶ 123.) And McNeff testified that Hoenig would be paid for "any sale that went through New York, direct sale that went through New York into their territory." (*Id.* ¶ 124.)

Moreover, Goodson, whose commission terms were identical to Hoenig's, testified that he understood that in order to get a 2% commission on Dealer/Distributor sales that the sales had to exceed the previous year's plan number. McNeff testified that Hoenig and the other salespersons were not entitled to commissions on distributor or dealer sales and that he does not believe the dealer sales in any year exceeded or met the threshold set forth in the Domestic

Commission Plan for Hoenig and the other salespersons to receive the 2% bonus on Dealer/Distributor sales. (DACSMF ¶¶ 82-84.)

Hoenig contends that discovery in this case has revealed the truth about her commission plan, that the limitation Goodson identified was not adopted for any of the salespeople, including her, and that McNeff did not testify truthfully and accurately. (PCSMF ¶¶ 82-84.)

Simply put, while Nasco acknowledges that Hoenig may have believed that she was entitled to this commission, it asserts that McNeff never promised to pay a 2% commission on all Dealer/Distributor sales. (DCPAMF ¶¶ 110, 122.)

## C. Determination and Calculation of Commissions

According to Nasco, from Hoenig's hiring by Simulaids as a full-time employee until 2021, when a new commission structure went into effect, Hoenig received commissions on all Direct Sales of Simulaids healthcare products that were invoiced through Simulaids, and were shipped into her territory, regardless of the role she had in procuring the sale. Hoenig only received commissions on any Direct Sales of Nasco Wisconsin healthcare products that: (a) were shipped into her territory; (b) she "procured"; and (c) she told McNeff about. (DACSMF ¶¶ 61-62.) McNeff testified that neither Hoenig nor any other salesperson would get credit for Dealer/Distributor sales for commission purposes and, if a salesperson was paid a commission on such sales, it was a mistake. (DACSMF ¶ 81.)

Nasco contends that Long confirmed that Hoenig and Goodson had the same understanding as he did about commissions on Dealer/Distributor sales. Long testified the only way the salespersons were entitled to commissions on Dealer/Distributor Sales is if there was a coding error and something was mislabeled a dealer sale when it was not, and he had sent the purchase order to the end user. (DACSMF ¶¶ 89-90.) Plaintiff denies that the limitation was ever

adopted. (PCSMF ¶¶ 89-90.) Further, Hoenig asserts that she also was eligible for and received multiple commission payments for Dealer/Distributor sales shipped to her territory. (PCSMF ¶¶ 61-62.)

*Commissions Related to Nasco Wisconsin*

The parties dispute the nature of Hoenig's commission structure with respect to Nasco Wisconsin sales. Nasco contends that Hoenig knew she had to provide McNeff with information regarding any sales she made through Nasco Wisconsin, for which she would then get credit. Otherwise, she would not receive a commission for the sale. McNeff testified during his deposition that Hoenig was credited for sales that went through Nasco Wisconsin if she told him that she was involved in (procured) the sale. (DACSMF ¶¶ 64-66).[14] According to Nasco, because Hoenig received commission reports monthly, she understood that she was not entitled to be paid commissions on all Nasco Wisconsin direct sales of healthcare products, but only on the sales that she brought in and told McNeff about. (DACSMF ¶¶ 69-70.)

Nasco contends that it never agreed to pay Hoenig a 2% commission on all sales in her territory regardless of whether she procured the sale. (DCPAMF ¶¶ 153-54.) It notes that Hoenig never demanded commissions on all Nasco Wisconsin Direct Sales of healthcare products that went into her territory, regardless of her involvement. In an email to McNeff dated April 15, 2019, Hoenig stated that she was aware of Nasco Wisconsin sales in her territory and the fact that she only received credit for customer accounts she worked on or procured. (DACSMF ¶¶ 71-72.)

Hoenig denies that the April 15, 2019 email demonstrates that she understood that she

---

[14]For example, on October 11, 2017, McNeff wrote to Hoenig and the other salespersons asking them to tell him whether they "have sales I don't know about." In December 2017, McNeff again asked the salespersons whether they had any sales "through Nasco [i.e. Nasco Wisconsin]." (DACSMF ¶¶ 67-68.)

would only be paid on Wisconsin sales that she "worked on or procured." (PCSMF ¶¶ 71-72.) Rather, her email states that "some of these are sales that [Goodson, Long] and I have worked on over the past two years. But never heard a word about." (ECF No. 83 Ex. 15.) Moreover, because McNeff repeatedly told her that he had no access to Wisconsin information, a request to McNeff would have been a waste of time. (PCSMF ¶ 71.) Hoenig also represents that she was never told that she would not receive a commission on invoices she did not procure. (PCSMF ¶¶ 69-70.)

According to Nasco, Hoenig checked her commission payments to ensure she was being paid what she was owed "[w]ith the commission reports [she] received from Jack [McNeff]." McNeff, in collaboration with others like Nasco's controller or head of accounting, would prepare Hoenig's commission report and send a copy to her for her review each month. Nasco states that Hoenig received at least "41 reports . . . in 48 months or 47 months" that she audited by comparing the dollar amounts of the commissions to confirm she was receiving what she believed she was owed. (DACSMF ¶¶ 44-47.) At various points throughout her employment, Hoenig reviewed her sales numbers with McNeff. Hoenig would contact McNeff when she had questions regarding her commission reports or sales numbers, and they had weekly and sometimes bi-weekly sales meetings. (DACSMF ¶¶ 48-50.) Hoenig notes that she attempted to ensure that she was properly paid for commissions but denies that she received all of her commission reports. (PCSMF ¶¶ 44-47.)

Nasco claims that Hoenig was "very astute at salesforce.com" and could use this system to track an order, including orders that went through Nasco Wisconsin, in which she was directly involved and which she had procured. Hoenig admits she used the Salesforce program to track all of her potential sales and customers, and that she gave McNeff purchase orders in support of Nasco Wisconsin sales as a matter of "habit." (DACSMF ¶¶ 53-55.) Hoenig contends, however,

that she was unable to compute the amount of commissions owed to her for Wisconsin sales by using Salesforce or otherwise. (PCSMF ¶ 69, 73.) She denies that the system was able to track sales orders and information. Although she tried to track her sales activities, she does not believe that Defendant caused all sales for which she was eligible for commissions to be properly documented. (PCSMF ¶¶ 53-55.)

According to Nasco, McNeff only had access to MAPICS, the system through which Hoenig's sales initiated through Simulaids were recorded, and McNeff could only change the data in MAPICS to add a sales representative's sales numbers. He did not have access to P-8, the system through which Hoenig's sales initiated through Nasco Wisconsin were recorded. (DCPAMF ¶¶ 150-52) Hoenig claims, however, that he could access the Wisconsin sales numbers. (PCSMF ¶¶ 150-52.) Because the MAPICS and P-8 systems were incompatible with each other, a software application called "QLIK" could be used to consolidate and display selected data from both MAPICS and P-8. Nasco states that QLIK was not used to compute salesperson commissions because the data entered into the program did not include data as to which salesperson was involved in the sale. (DCPAMF ¶ 152.)

According to Nasco, McNeff expected salespersons to reach out if they needed information related to their Nasco Wisconsin sales. (DCPAMF ¶ 149.) In order for Hoenig to get credit for a Nasco Wisconsin sale, McNeff "would either need to know what the item was and the customer or the order number or the invoice number." Because the P-8 program lacked the codes for each individual sales representative (which it still did not have when added to QLIK), it also lacked the requisite information for him to determine which sales were attributable to which sales representative. (*Id.* ¶¶ 150-52.)

Hoenig disputes that QLIK did not include data as to which salesperson was involved in a

given sale. (PCSMF ¶ 11.)[15] Two salespersons testified that the P-8 sales data was available through a software program called "Host." Further, McNeff admitted that this information was available to him and forwarded to Hoenig a link to a dropbox to which she had previously been given access. (PCSMF ¶ 59.)

According to Nasco, after the 2021 merger (the date of which is disputed), P-8 was phased out and Wisconsin's system was transferred to MAPICS. While she was still working for Nasco, Hoenig received from a senior executive a spreadsheet, generated through QLIK, containing all sales transactions within both Nasco Wisconsin and Simulaids covering a period from 2017 through October of 2020. (DACSMF ¶¶ 59-60.) Hoenig disputes this, asserting that the P-8 system was eliminated in 2020 and that in fact, McNeff had access to sales information from the Wisconsin operation. (PCSMF ¶ 59.)

D. New Compensation Structure

In 2021, Nasco rolled out a new compensation structure under which Hoenig and the other salespeople would be paid commissions on all Dealer/Distributor sales in their territory. Nasco asserts that prior to the implementation of this new compensation structure, neither Hoenig nor the other salespeople were ever paid commissions on Dealer/Distributor sales. (DACSMF ¶¶ 56-58.)

While acknowledging that Nasco created a "new" commission structure in January 2021, Hoenig claims that its obligation to pay her commissions on Dealer/Distributor sales was not newly created at that time. (PCSMF ¶ 57.) She was paid commissions on Dealer/Distributor sales

---

[15] According to Nasco, QLIK did not become available for use until late 2019 or early 2020. (DACSMF ¶¶ 9-12.) Hoenig asserts that the QLIK system was in use by September 2017. (PCSMF ¶ 12.) Hoenig states that during this lawsuit, and after she was given access to QLIK and the P-8 and MAPICS platforms on April 30, 2020, she trained herself on these programs and subsequently ran a report that would identify all commissions due and owing to her, which was called "Big Boy I." (PCSMF ¶ 154.)

on multiple occasions, although McNeff claimed that these commissions were "a mistake." (*Id.* ¶ 58.)

    E.  <u>Plaintiff's Claimed Damages</u>[16]

Hoenig contends that she did not receive all commissions to which she was entitled. (PCSMF ¶ 63.) She claims that she was not paid commissions totaling $391,468.26 for Direct Sales to her territory for the period 2017 through March 2021 and she was not paid $855,143.59 in commissions on Dealer/Distributor sales in her territory from the period 2017 through March 2021. (PCSMF ¶ 61.)

Nasco contends that Hoenig seeks commissions on all sales in her territory, including Dealer/Distributor sales, intercompany Sales and international sales, whether or not she procured those sales. Hoenig admits, however, that she was not entitled to commissions on intercompany sales,[17] OEM sales, international sales, customer giveaways or demo sales. (PCSMF ¶¶ 74, 79.) Thus, the parties agree that these damages cannot and will not be sought in this case.

At the same time, there are genuine issues of material fact regarding Hoenig's entitlement to the other damages she seeks. (See, e.g., PCSMF ¶¶ 61, 62, 63, 74, 97; DACSMF ¶¶ 61, 62, 63, 74, 97.) Thus, matters related to these damages must be resolved at trial.

---

[16] Nasco devotes a portion of its motion for summary judgment to a critique of the work of Hoenig's expert in calculating damages. The Court concludes that issues related to his opinions and the basis for his opinions are not relevant to the disposition of Nasco's motion as there are genuine issues of material fact as to liability issues. Therefore, it is premature at this time to make any ruling on Hoenig's claimed damages, about which there are also genuine issues of material fact, other than those commissions/damages which she has admitted that she is not entitled to claim.

[17] Hoenig does assert, however, that while she was not entitled to a commission on intercompany "transfers," she was entitled to a commission on the end user of the product that was transferred as an intercompany "sale." (PCSMF ¶ 74.)

III.   **Standard of Review**

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

IV.   **Discussion**

A.  Breach of Contract Claim

In Count I, Hoenig asserts a breach of contract claim in which she seeks various commissions. Nasco contends that there is no contractual basis for these commissions.

"Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citation omitted). "To prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a "reasonable certainty." *Id.* at 225-26.

"Under Pennsylvania contract law, the terms of the contract determine when commissions are computed and paid." *Hicks v. Glob. Data Consultants, LLC*, 288 A.3d 875, 887 (Pa. Super. 2022), *appeal denied*, 298 A.3d 38 (Pa. 2023). *See also O'Donnell v. Passport Health Commc'ns, Inc.,* 2013 WL 1482621, at *9 (E.D. Pa. Apr. 10, 2013) ("[t]he contract between the parties governs whether specific wages or commissions are 'earned'" for purposes of the WPCL) (quoting *Sendi v. NCR Comten, Inc.,* 619 F. Supp. 1577, 1579 (E.D. Pa. 1985), *aff'd,* 800 F.2d 1138 (3d Cir. 1986))).

Hoenig was an at-will employee at Nasco. An employer cannot retroactively modify the terms of compensation for work already completed but may prospectively change the commission structure because "when an employer notifies an employee of changes to the at-will employment contract and the employee continues working with knowledge of the changes, the employee has accepted the changed terms." *Hicks*, 288 A.3d at 886.

Citing *Sherman v. Composition Systems,* 2013 WL 4193509, *5-6 (E.D. Pa. Aug. 13, 2013), Nasco asserts that Hoenig must demonstrate that she was the "procuring cause" of the sale in order to be entitled to a commission.[18] The central issue here, however, is what the parties agreed to regarding Hoenig's commissions, since they could have agreed to any terms with respect to her entitlement to commissions regardless of whether Hoenig was the "procuring cause."

In support of her breach of contract claim, Hoenig cites *McGough v. Broadwing Communications, Inc.*, 177 F. Supp. 2d 289 (D.N.J. 2001). In that case, two former salesmen brought suit after they were terminated, seeking unpaid commissions and bonuses under Pennsylvania law. The defendant argued that the compensation plan they cited did not support their claims. Noting that an express contract is formed when the terms of an agreement are declared either verbally or in writing, the court noted that a contract may be implied-in-fact even where no such clear declaration exists:

> A contract implied-in-fact is an actual contract which arises when parties agree on the obligation to be incurred, but their intention, instead of being expressed in words, is inferred from the relationship between the parties and their conduct in light of the surrounding circumstances. *See Halstead v. Motorcycle Safety Foundation, Inc.*, 71 F. Supp. 2d 455 (E.D. Pa. 1999). An offer and acceptance need not be identifiable and the moment of formation need not be precisely pinpointed. *See Ingrassia Construction Co., Inc. v. Walsh*, 337 Pa. Super. 58, 67, 486 A.2d 478 (1984). In general, there is "an implication of a promise to pay for valuable services rendered with the knowledge and approval of the recipient, in the absence of a showing to the contrary." *Martin v. Little, Brown and Company*, 304 Pa. Super. 424, 429, 450 A.2d 984 (1981).

*Id.* at 296-97 (footnote omitted). The court held that the plaintiffs had sufficiently alleged the existence of a binding contractual relationship based on their services as sales managers and the employer's promise to pay them for services rendered. *Id.* at 297.

---

[18] As *Sherman* addressed whether the plaintiff was entitled to commissions for sales completed after his termination, this decision has marginal relevance to the issues presented here.

17

Hoenig contends that, like the plaintiffs in *McGough*, she can point to an oral agreement to pay her a certain base salary plus commissions in exchange for performing certain services and further, that the precise terms of the commission structure were not clear. She argues that Nasco occasionally paid the commissions to which it had agreed, but more often it did not. Therefore, she argues that she may prove Nasco's contractual obligations by an express or implied promise to pay her.

Nasco contends that Hoenig is not entitled to commissions on several categories of sales: Direct Sales made through Nasco Wisconsin; all Dealer/Distributor Sales claimed in this action; and intercompany sales, international sales, first order internet sales, giveaways and demos. Each of these categories will be addressed in turn.

*Direct Sales*

Nasco contends that: Hoenig was only entitled to commissions on sales procured through Nasco Wisconsin if she provided documentation to McNeff to demonstrate that she actually procured the sale. Hoenig contends that she had a contractual basis for receiving commissions on all direct sales shipped to her territory, both from New York and Wisconsin, whether or not she initiated the sale.

Nasco has submitted a substantial amount of evidence supporting its position that commissions were only owed on Nasco Wisconsin sales that were "procured" by Hoenig and about which McNeff was notified. The April 11, 2017 email includes McNeff's statement that "all direct sales need to go through Simulaids so I can track." As previously discussed, Hoenig has admitted that this was the agreement at the time. Notably, however, in the April 24, 2017 email, which may have changed the commission arrangement, McNeff states that "*it would be best* if all your sales LF or Simulaids came through here. Much easier to track." (emphasis

supplied.) As discussed previously, the parties dispute whether McNeff could track Nasco Wisconsin sales.

More significantly, however, neither email references anything about an obligation to procure a sale through Nasco Wisconsin in order to receive a commission. While Nasco has produced evidence that Hoenig was so advised, Hoenig represents that she was never told that she would not receive a commission on Wisconsin invoices for sales in her territory that she did not procure.

While Nasco's arguments are compelling, and it is somewhat implausible to conclude that the parties agreed that Hoenig was entitled to sales about which she had no involvement for what may have been, at least for a time, a company that Hoenig did not work for, it remains the case that there are genuine issues of material fact about this claim that compel denial of Nasco's motion. Moreover, although Nasco argues that Hoenig's damages for direct sales are entirely speculative, the Court concludes that even if flawed in the ways that Nasco contends, they are not wholly speculative.

These positions present classic examples of genuine disputes of material fact that the jury will have to resolve. The Court "may not . . . weigh the evidence or make credibility determinations as these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (citation omitted). *See also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'") (quoting *Anderson*, 477 U.S. at 255). The jury will have to evaluate the credibility of the competing testimony of Hoenig and McNeff regarding the commission structure for these direct

sales.

*Dealer/Distributor Sales*

As Nasco correctly points out, and as discussed herein, Hoenig has made inconsistent statements about what represents the parties' agreement as to commissions for Dealer/Distributor Sales. In the Complaint and Amended Complaint, she cited the April 11, 2017 email (which contained the limitation that she had to exceed the prior year's Dealer/Distributor sales before she could collect commissions). However, the Court has stricken the statement in her Affidavit contradicting these allegations. Thus, Hoenig agreed to the terms of the April 11, 2017 Domestic Commission Plan.

Nonetheless, the parties agree that they discussed the email after it was sent. While they dispute what was said, Hoenig claims that McNeff told her to disregard the limitation on commissions. And whether she cited the April 24, 2017 email in her Complaint or Amended Complaint, it remains possible that it represents a revised version of the commission terms since it makes no reference to any limitation on Dealer/Distributor sales, and there is some other evidence in the record thereafter that no such limitation was mentioned.[19]

Thus, regardless of the allegations in Hoenig's Complaint and Amended Complaint, the record includes some contradictory evidence that may support her position. As the non-moving party, Hoenig is entitled to all reasonable inferences in her favor.

*Intercompany Sales, International Sales, OEM Sales, first time internet sales, giveaways and demos.*

As noted above, Hoenig "makes no claim in this case for unpaid commissions on 'customer giveaways; demo sales, OEMs (or) international sales.'" Nonetheless, Nasco notes,

---

[19] Hoenig notes that neither Nasco's supporting brief or statement of material facts mentions the April 24 email. The Court makes no conclusion about why Nasco did not discuss this email.

she has included damage claims for these sales. Since Hoenig acknowledges that she is not making a claim for any commissions on these sales, Nasco's motion will be granted as to any claim that was previously asserted.

On the other hand, the parties dispute whether Hoenig was entitled to a commission on "first time internet sales." (DACSMF ¶ 78; PCSMF ¶ 135; DCPAMF ¶ 135.) And they dispute whether Hoenig was entitled to a commission on "intercompany sales" as opposed to "intercompany transfers." (DACSMF ¶ 74; PCSMF ¶ 74.) Therefore, summary judgment will not be granted with respect to these claims.

Thus, with respect to Count I, the motion for summary judgment will be granted in part and denied in part.

B.   WPCL Claim

The WPCL imposes a statutory duty on "every employer" to pay "all wages" due to employees. 43 P.S. § 260.3. Employees may bring a civil action to recover such wages. 43 P.S. § 260.9a. However, "the WPCL does not create a right to compensation . . . [r]ather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned." *De Ascencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003) (citations omitted).

In addition to providing for the recovery of earned but unremitted compensation, the statute permits an employee whose earned wages remain unpaid for a specified period of time to recover exemplary damages where "no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for non-payment." 43 P.S. § 260.10.

Nasco contends that because Hoenig cannot substantiate a right to commissions, she

cannot proceed with a claim under the WPCL either. In turn, Hoenig argues that she has identified genuine issues of material fact regarding whether she is entitled to various commissions, as outlined above.

Given these issues of fact, with respect to Count II, Nasco's motion for summary judgment will be granted with respect to Hoenig's claims for unpaid commissions on customer giveaways, demo sales, original equipment manufacturers sales and international sales and denied in all other respects.

C. Fraudulent Concealment Claim

In Count III, Hoenig asserts claim of fraudulent concealment, contending that McNeff falsely told her that she would be paid certain commissions even though he never intended to do so. Nasco argues that Hoenig cannot prevail on this claim. The Court agrees.

The doctrine of fraudulent concealment is "based on a theory of estoppel, and provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005) (citation omitted). "The doctrine does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception. The plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence." *Id.* As the Court of Appeals has noted, "the fraudulent concealment doctrine does not toll the statute of limitations where the plaintiff knew or should have known of his claim despite the defendant's misrepresentation or omission." *Mest v. Cabot Corp.*, 449 F.3d 502, 516 (3d Cir. 2006) (citation omitted). Moreover, as Nasco notes, the limitations period is not tolled unless there has been "some affirmative independent act of concealment upon which the [plaintiff] justifiably relied." *Kingston Coal Co. v. Felton Mining*

22

*Co.,* 690 A.2d 284, 291 (Pa. Super. 1997).

The statute of limitation for fraud in Pennsylvania is two years. 42 Pa. C.S. § 5524(7). Nasco claims that Hoenig asserted a fraudulent concealment claim solely to toll the statute of limitations on the fraud claim in Count IV which would otherwise be barred. It asserts that Hoenig cannot maintain this claim because she admits that although Nasco actually provided her with information about her sales, she did not bring a claim within two years. *See SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 218 (3d Cir. 2022) (fraudulent inducement claim barred when it was not brought within two years of the date university had constructive knowledge of a potential material representation).

According to Hoenig, despite the exercise of due diligence, she was unable to discover that McNeff never intended to pay her for the sale of Wisconsin products until October 2020.[20] That is not the issue, however. Rather, the statute begins to run when Hoenig know or should have known that she was not receiving all the commissions she claims were due. Moreover, there is no evidence that McNeff had no intention of paying her; rather, it is undisputed that McNeff told Hoenig that in order to receive a commission for Nasco Wisconsin direct sales, she was told that she had to advise him of her involvement in such sales.

Even if Hoenig prevails in her breach of contract claim, there is no evidence of an affirmative act of concealment on the part of McNeff. And by her own admission, even given her position that she did not have to procure a sale to be entitled to a commission, she received monthly reports and knew in 2017 that she was not receiving commissions on Wisconsin sales. Thus, she knew that she was not receiving all of her commissions "despite the defendant's

---

[20] Hoenig's brief stated that she did not learn of McNeff's intentions until his deposition on September 13, 2022 (ECF No. 92 at 22). In her sur-reply, however, she indicates that this was a typographical error (ECF No. 111 at 5 n.3).

misrepresentation or omission." Whether she knew at that time that McNeff was not being truthful when he indicated that he had no access to certain data is simply not relevant.

Therefore, the motion for summary judgment as to Count III will be granted.

### D.   Fraud Claim

Hoenig's fraud claim in Count IV is based on actions of McNeff that she claims kept her from receiving her commissions. Nasco moves for summary judgment on this claim based upon the expiration of the statute of limitations and the gist of the action doctrine.

Under Pennsylvania law, the statute of limitations for a fraud claim is two years. Plaintiff knew in 2017 that she was not receiving all of her commissions. She did not amend her Complaint to allege fraud until 2022, more than five years later. The fraud claim is therefore barred by the expiration of the statute of limitations.[21]

Thus, the motion for summary judgment will be granted with respect to the fraud claim in Count IV.

## V.  Conclusion

For the reasons explained above, Nasco's motion for summary judgment will be granted in part and denied in part.

An appropriate order follows.


Dated: March 19, 2024                         /s/ Patricia L Dodge
                                              PATRICIA L. DODGE
                                              United States Magistrate Judge

---

[21] Because the statute of limitations bars this claim, the Court need not reach the issue of the gist of the action doctrine.